Filed 5/2/25  In re F.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re F.M., a Person Coming Under the Juvenile Court Law. | D084960 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.M.,<br><br>Defendant and Appellant. | (San Diego County Super. Ct. No. EJ4745B) |


APPEAL from an order of the Superior Court of San Diego County, Mark T. Cumba, Judge.  Affirmed.

Mansi Thakkar, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

A.M. (Mother) appeals from the juvenile court's order terminating her parental rights to her then two-year-old daughter, F.M. (Welf. & Inst. Code,[1] § 366.26.) She contends the juvenile court erred in finding the parental-benefit exception to adoption did not apply. (*Id*., subd. (c)(1)(B)(i).) We conclude Mother has not affirmatively demonstrated error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *The Agency's Petition*

In February 2022, the San Diego County Health and Human Services Agency (Agency) received a child welfare referral alleging that Mother tested positive for amphetamines after giving birth to F.M. Hospital staff reported that F.M.'s meconium results were positive for methamphetamines, amphetamines, and marijuana. Mother admitted to using drugs several days earlier.

The Agency filed a juvenile dependency petition under section 300, subdivision (b), alleging that Mother failed to protect F.M. because she had a history of drug use, she used drugs during her pregnancy, she tested positive for amphetamines, and that F.M.'s umbilical cord tested positive for amphetamines and methamphetamines. The petition further alleged the father, J.W., had a history of drug use and was unable to protect F.M.[2]

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] J.W. is not a party to this appeal and will only be mentioned when necessary for context.

At the detention hearing, the court detained F.M., after finding a prima facie case existed under section 300 and no reasonable means existed to prevent detention. The court granted Mother supervised visitation.

## II.

### *Jurisdiction and Disposition*

In March 2022, Mother reported to the social worker that she was thirteen when she started using methamphetamines. She used the drug daily in high school and then occasionally with her friends after that. She quit using drugs when she found out she was pregnant with F.M., but started again the last two weeks of her pregnancy because she was in extreme pain and could not function. She told the social worker she had been sober and in a substance abuse treatment program for the past month.

At the jurisdiction and disposition hearing in May 2022, the juvenile court sustained the allegations in the petition, declared F.M. to be a dependent of the court, and ordered her removed from Mother's care and custody pursuant to section 361, subdivision (c)(1). The court ordered reunification services for Mother.

## III.

### *Reunification*

At a six-month review hearing in January 2023, the court found that Mother had maintained her sobriety and had completed her substance abuse treatment program and parenting classes. It returned F.M. to Mother's care and custody. The court congratulated Mother on her sobriety and granted her family maintenance services.

At the status review hearing in July 2023, the Agency's recommendation was to terminate jurisdiction. Mother completed her services and maintained she did not need any further help. She continued to

work at a convenience store part-time and arranged for childcare for F.M. while she worked.  However, F.M.'s attorney set the matter for trial.

Mother then failed to drug test on multiple occasions but maintained she was not using drugs.  By the time of the contested review hearing in September 2023, there was an open referral regarding allegations of substance abuse by Mother and concerns for F.M. having a bruise and appearing unkempt, ill, and tired.  The court continued the contested hearing.  The court continued the hearing again the following month due to Mother's failure to drug test and another referral regarding allegations Mother was abusing substances.

## IV.

### *The Agency's Supplemental 387 Petition*

In October 2023, the Agency filed a supplemental juvenile dependency petition pursuant to section 387.  The Agency requested F.M.'s removal from Mother due to her failure to drug test, her refusal to allow the Agency into her home, and for leaving F.M. overnight with a 14-year-old sibling.  The sibling described watching F.M. to ensure F.M. did not get into things and said the family's home was dirty, cluttered, and had flies and rats.  She also said the couch was urine-soaked and explained they obtained electricity and water from the neighbors.

At the detention hearing on the supplemental petition in October 2023, the court found a prima facie showing had been made and that the previous disposition had not been effective.  It ordered the Agency to remove F.M. from Mother and return her to the prior resource family.

Mother denied relapsing, but a few days later, tested positive for methamphetamines and amphetamines.  After that, she avoided contact with

4

the Agency and drug testing and did not enroll in any services. She blamed F.M.'s sibling and did not understand why F.M. was removed.

F.M. returned to her resource family with tangled hair and grime in her nails and hair. She was also dehydrated, lethargic, and had lost muscle tone. She was timid at first but adjusted smoothly to living in their home again.

In February 2024, the court held a contested adjudication hearing and sustained the supplemental petition. The court found that removal was necessary and removed F.M. from Mother's care and custody pursuant to section 361, subdivision (c). The court did not grant Mother reunification services and set the matter for a hearing pursuant to section 366.26.

V.

*The Agency's 366.26 Report and Mother's 388 Petition*

In its May 2024 report, the Agency described F.M. as being sweet, bright, and happy and without any medical or emotional needs that would pose a barrier to adoption. The Agency assessed F.M. as specifically and generally adoptable and her caregivers were committed to adoption. F.M.'s caregivers were a married couple with two other children, ages one and two, and no criminal or child welfare history. F.M. was initially placed with them after being discharged from the hospital, and then again when she was detained after the 387 petition was filed. The Agency noted that the caregivers met F.M.'s needs and wanted to adopt her.

The Agency also assessed that no exceptions to adoption applied. The father's whereabouts were unknown. The Agency agreed Mother maintained regular and consistent visitation and contact with F.M. The Agency also agreed F.M. had a substantial, positive, emotional attachment to Mother.

However, the Agency determined that the benefits of adoption outweighed any detriment.

In August 2024, Mother filed a section 388 petition asking the court to reinstate her reunification services and return F.M. to her care and custody. It included a letter from her service provider indicating that she had enrolled in a recovery program that provided individual and group therapy, parenting classes, and individualized treatment plans.

Mother continued to visit F.M. regularly and consistently. She came prepared to each visit with a variety of healthy food and snacks, engaged F.M. in play, and continued to be affectionate towards F.M. She also continued to be attentive to F.M.'s needs and kept her safe by redirecting her. F.M. continued to enjoy her visits, but she always separated easily at the end of visits without concerning behavior or change in demeanor.

VI.

*Combined 366.26 and 388 Hearing*

In October 2024, the court held a combined hearing pursuant to sections 366.26 and 388. Mother, F.M.'s maternal grandmother, F.M.'s two sisters and the caregivers were all present.

The hearing commenced with Mother orally amending her section 388 petition to include language that she had been sober since July 2024. The court denied the petition, finding that there had not been a change of circumstances and that it was not in F.M.'s best interests to grant it.

Mother testified for the section 366.26 portion of the hearing that she was allowed to visit two days a week, for two hours. They would play, eat lunch, go for walks, and ride bikes and she would read to F.M. She believed she was a great role model, despite her past substance abuse, and testified that she showed kindness to everyone, volunteered at church and at the kids'

6

school, and that she had good friends and a good support system. F.M. called her "mom" and was excited to see her at visits, would run up to her and give her hugs, and that F.M. loved hanging out with her.

Mother's counsel asked the court to apply the parental-benefit exception to adoption and not terminate Mother's parental rights to F.M. Counsel emphasized the substantial, positive and loving bond F.M. shared with Mother.

F.M.'s sibling's counsel asked the court not to terminate Mother's parental rights and find that the sibling exception applied. She noted that F.M and her sibling resided together for five months and shared a strong sibling bond.

Both county counsel and F.M.'s counsel asked the court to terminate Mother's parental rights and find that no exceptions applied. They conceded that Mother satisfied the first two prongs required for the application of the parental-benefit exception: maintaining consistent visitation and sharing a substantial, positive relationship. They argued that the benefits of adoption outweighed any potential detriment to F.M. caused by the termination of Mother's parental rights.

The juvenile court found by clear and convincing evidence that F.M. was both generally and specifically adoptable. The court then found that the sibling exception did not apply, indicating that application of the sibling exception was rare, and that on balance, the benefits of adoption outweighed application of the exception.[3]

Regarding the parental-benefit exception, the court found that Mother satisfied the first two prongs necessary for application of the exception under

---

[3]    Mother does not challenge the court's finding that sibling exception did not apply in this appeal.

*In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), but did not satisfy the third prong. Specifically, it found that Mother maintained consistent visitation and contact with F.M., and that F.M. and Mother shared a substantial positive emotional attachment.

With respect to the third prong, the court noted it must look at "whether losing a relationship with [Mother] would harm [F.M.] to the extent not outweighed on balance by the security of a new adoptive home." The court recognized that issues that led to dependency are relevant but not a "categorical bar" to the exception. It considered the argument Mother had been sober since June 2024, but also the evidence that she had a positive test in September 2024. It "looked[ed] at whether those struggles sp[oke] to the benefit or a lack thereof of continuing" Mother's relationship with F.M.

The court considered how F.M. would be affected by losing the relationship with Mother and what life would be like for F.M. in an adoptive home without Mother. It also considered the possibility F.M. might experience emotional instability, acting out, or difficulties in school, but also considered that a secure and stable home could alleviate those problems. The court noted the evidence demonstrated that F.M.'s current caregivers provided a safe, stable, secure home for the majority of F.M.'s life; that F.M. had been thriving, meeting milestones, growing, and developing in their home; and that F.M. had minimal difficulty transitioning from visits with Mother.

Thus, on balance, the court found Mother did not satisfy her burden with respect to the third prong. It stated: "There's evidence that there's nominal or minimal, if any, difficulty for [F.M.] to transition when she leaves visits with [Mother] or misses visits" with Mother. It concluded, "So, on balance, the court is going to find that the benefits of adoption outweigh any

8

detriment of severing the parent-child relationship."  It then terminated Mother's parental rights.

DISCUSSION

I.

*General Legal Principles*

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed."  (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.)  At this hearing "the juvenile court has three options: (1) to terminate parental rights and order adoption as a long term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long term foster care. Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan.  The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions."  (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534 [cleaned up].)

One of the exceptions to the preference for adoption is the parental-benefit exception.  (§ 366.26, subd. (c)(1)(B)(i).)  For this exception to apply, the parent must show by a preponderance of the evidence: (1) regular visitation and contact with the child; (2) the child has a substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.  (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

The first element, visitation, is "straightforward," requiring that the " 'parents visit consistently,' taking into account 'the extent permitted by

9

court orders.' " (*Caden C., supra*, 11 Cal.5th at p. 632.) The second element focuses on the child and is determined by taking into consideration factors such as " 'the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid*., citing *In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.) For the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Caden C*., at p. 633 [cleaned up].) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Id*. at p. 634.)

When deciding whether terminating parental rights would be detrimental to the child, the court is not comparing the parent's and custodial caregiver's attributes. (*Caden C., supra*, 11 Cal.5th at p. 634.) Additionally, a parent's lack of progress in addressing the issues that led to dependency is not determinative. (*Id*. at p. 637.) Nonetheless, a parent's inability to address the issues leading to dependency can be relevant in assessing whether the interaction between parent and child "has a 'negative effect' on the child." (*Ibid*.) Performing this analysis is a "subtle enterprise." (*Id*. at p. 634.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Ibid*.)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) As a reviewing court, we do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. (*Id.* at p. 640.) We will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Ibid.*) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*) A court abuses its discretion when it makes an arbitrary, capricious, or patently absurd determination.[4] (*Id.* at p. 641.)

## II.

### *The Juvenile Court Did Not Abuse Its Discretion in Terminating Parental Rights*

The Agency concedes substantial evidence supported the juvenile court's finding that Mother met this element, and our review of the record shows that Mother maintained consistent visitation. Although the juvenile court noted "there was a month when there was a series of missed visits," it found "there were legitimate reasons for those missed visits" and that "overall" Mother consistently visited F.M.

---

4    The *Caden C.* court explained " 'there likely will be no practical difference in application of these two standards,' " but "[a]t its core, the hybrid standard [it] now endorse[s] simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

On the second element, whether Mother provided F.M. with the type of substantial, positive emotional attachment, the Agency also concedes substantial evidence supported the juvenile court's finding that Mother met this prong of the analysis. We agree with the Agency's concession on the second prong of the *Caden C.* analysis.

We now look to the third prong. We concluded, contrary to Mother's assertion, that the juvenile court engaged in a comprehensive analysis as to whether Mother met it, tracking the guidance in *Caden C.* (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 633–634.) The court here weighed the harm to F.M. of losing the relationship with Mother against the benefits of placement in a new, adoptive home. (*Id*. at p. 640.) It considered how F.M. would be affected by losing the relationship with Mother and what life would be like for F.M. in an adoptive home without Mother. It considered the possibility F.M. might experience emotional instability, acting out, or difficulties in school; but also considered that a secure and stable home could alleviate those problems.

After independently reviewing the entire record, we conclude the court did not abuse its discretion in finding that terminating the relationship would not be detrimental to F.M. "when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) The Agency removed F.M. from Mother's custody when she was a newborn and she spent most of her life with her resource family and prospective adoptive parents. Although F.M. lived with Mother for 10 months during the open case, F.M. was cared for primarily by F.M.'s sibling, who described their living environment as dirty, cluttered, and with flies and rats. Her sibling also reported their couch was urine-soaked and that the family obtained electricity and water from the neighbors. When F.M. returned to her

12

resource family, she had tangled hair and grime in her nails and hair. She was also dehydrated, lethargic, and had lost muscle tone. Within months, F.M. made strides in all her services; her physical health and strength improved; and her speech developed rapidly. Her caregivers were committed to providing that stability and structure moving forward.

Like the Agency and the juvenile court, we have no doubt Mother loves F.M. But she points to no evidence that terminating F.M.'s relationship with her would be detrimental to F.M.; she identified no specific harm F.M. would suffer from the loss of this relationship; and she offered no theory under which we could conclude that F.M.'s loss of her relationship with Mother would outweigh the benefit of stability to F.M. in a new adoptive home.

In contrast, the record supports the court's determination that F.M.'s current caregivers provided a safe, stable, secure home for the majority of F.M.'s life; that F.M. had been thriving, meeting milestones, growing, and developing in their home; and that F.M. had minimal difficulty transitioning from visits with Mother. Viewing the evidence in the light most favorable to the juvenile court's order (*Caden C.*, *supra*, 11 Cal.5th at p. 640), as we must, we conclude the juvenile court did not abuse its discretion in declining to apply the parental-benefit exception to adoption.

13

## DISPOSITION

The order terminating parental rights is affirmed.

DO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

CASTILLO, J.